UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ANTRELL A. TEEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:18-cv-996-GCS |
| | ) |
| CHARLES GERMAINE, and | ) |
| CHRISTOPHER LANZANTE, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

On April 19, 2018, a single claim was severed into this action from the claims in Case No. 3:18-cv-568-JPG. Plaintiff Antrell Teen alleges that he was exposed to unconstitutional conditions of confinement when he was exposed to harmful exhaust fumes while incarcerated at the St. Clair County Jail. According to Teen, Defendants Charles Germaine and Christopher Lanzante were deliberately indifferent to his health and safety when they failed to act appropriately to prevent or limit his exposure to the dangerous fumes. By motion dated February 28, 2020, Defendants moved for summary judgment on the merits of Teen's claims. For the reasons delineated below, Defendants' motion is granted.

### FACTUAL BACKGROUND

At all times relevant to his complaint, Teen was an inmate in the custody of the St. Clair County Jail. Teen was arrested and incarcerated beginning in 2015 as a pretrial detainee, but on January 23, 2016, Teen was convicted of aggravated battery and first-

degree murder. By 2018, he was still in the custody of the St. Clair County Jail, but he was a convicted, post-trial prisoner. Defendants Charles Germaine and Christopher Lanzante both worked as correctional officers at the jail.

This case arises out of a short period of time when Teen was housed on L-Block at the jail. Teen was transferred to L-Block on January 29, 2018, and he remained housed there until March 16, 2018. (Doc. 56-2). At around 7:00 or 8:00 a.m. each Thursday morning while he was housed in L-Block, Teen claims that he was exposed to exhaust fumes and that the smell lasted for roughly 30 to 45 minutes. (Doc. 56-1, p. 3-4). He described the smell as similar to a box truck exhaust or mechanical objects rubbing together. *Id.* Teen further testified that he felt the smell was harsher than car exhaust fumes and that it made him feel lightheaded and woozy. (Doc. 56-1, p. 4). His eyes would burn, and he would have headaches and a scratchy throat. (Doc. 56-1, p. 12). Teen also said he heard a machine running during the periods when he smelled the fumes. (Doc. 56-1, p. 4). When the odor dissipated, so did Teen's headaches and other symptoms. (Doc. 56-1, p. 5, 20).

Teen first smelled the fumes on February 1, 2018. He asked a correctional officer, Officer Taylor, for assistance, and Taylor set up an industrial-sized fan and opened the door to the cell block to improve ventilation. (Doc. 56-1, p. 5). Defendants were not aware of or involved in the response to the fumes on February 1, 2018. On February 8, 2018, however, Teen testified that Germaine was making rounds when the odor was present for a second time. Germaine "just plainly refused to open the door" to L-Block even though Germaine allegedly smelled the fumes. (Doc. 56-1, p. 7). Teen and Germaine got

into a "disagreement" because Teen was screaming for Captain Collins, the sergeant, to come force Germaine to get the fan and improve air circulation. (Doc. 56-1, p. 7-8). Collins and three officers, including Lanzante, came in response to the disturbance. (Doc. 56-1, p. 8). One officer, Miller, opened the door and got the fan about an hour after Teen first asked Germaine for the fan. (Doc. 56-1, p. 8).

The next fume exposure was on February 15, 2018, but neither Lanzante nor Germaine were involved in the response to the fumes that day. (Doc. 56-1, p. 10). Teen testified that he could not remember his first issue with Lanzante, but he recalled a second issue on February 22, 2018, when Lanzante allegedly refused to accept and turn in Teen's captain's complaints and failed to get a supervisor. (Doc. 56-1, p. 11, 18). Teen did not smell the fumes again until March 8, 2018. (Doc. 56-1, p. 18). He testified that Germaine again disregarded his plea for help and refused to get the fan. (Doc. 56-1, p. 18). Teen explained that he named Germaine and Lanzante in this action because they did not take actions to ameliorate the fumes like setting up a fan or notifying a supervisor even though they knew about the smell. (Doc. 56-1, p. 12).

Teen submitted a series of captain's complaints about the fumes. On February 9, 2018, he complained about the fumes he smelled on February 1st and 8th, which apparently came from a truck that had pulled into or near the jail. A supervisor responded and advised Teen to report the issue more promptly so that officers could talk with the driver of the truck. (Doc. 56-6, p. 1). On February 15, 2018, Teen filed a complaint because he had submitted earlier complaints about the fumes and officers refusing to get supervisors for issues they could not handle. Teen wrote that he had not received any

responses. Officer Harris responded to the complaint stating that he did not notice any odor, but he notified maintenance and opened the door to allow air circulation. A supervisor agreed with Officer Harris's approach and signed off on the complaint on February 15, 2018. (Doc. 56-6, p. 3). There is a complaint from Teen written on February 22, 2018, but it is unrelated to his allegations in this case. (Doc. 56-6, p. 6).

Teen testified that his symptoms typically ended when the fumes subsided each week. (Doc. 56-1, p. 5, 20).[1] He testified that he submitted a sick call on February 15, 2018, because he wanted a checkup to see if he had health issues from the fumes. (Doc. 56-1, p. 15). This is the only sick call request he claims to have made related to medical issues caused by the fumes. Teen did not see anyone in the healthcare unit right away, and by his next healthcare appointment in May 2018, he did not mention any issues related to the fumes because he "[h]ad other pressing issues." (Doc. 56-1, p. 16). No records confirm whether Teen submitted the sick call as he testified.

The evidence suggests that the exhaust fume odor came from a back-up generator system at the jail as opposed to a truck. Defendants provide an affidavit from Lee Branstetter, a maintenance foreman for the St. Clair County Public Buildings Commission, who works full-time in the St. Clair County Jail. (Doc. 56-4). He avers that, at all times relevant to Teen's allegation the ventilation system at the jail was in compliance with the regulations set in the Illinois County Jail Standards, and he explains

---

[1] In an affidavit attached to his responsive brief, Teen claims for the first time that his symptoms were longer-lasting and more severe. A party, however, "cannot defeat a motion for summary judgment by 'contradict[ing] deposition testimony with later-filed contradictory affidavits.'" *LaFary v. Rogers Group, Inc.*, 591 F.3d 903, 908 (7th Cir. 2010)(quoting *Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir. 2005))(alteration in original).

that the jail maintains a back-up power generation system that has two diesel powered generators. The generators must be given weekly test runs as part of their maintenance process. The tests are routinely performed on Thursday mornings. During the tests, the generators are started and system measurements, including amps, volts, oil psi and coolant temperatures, are taken. The tests are regulated by a timer that automatically starts and ends each test run after exactly one hour.

Branstetter maintains that he is unaware of any defects in the system during February 2018 and March 2018, and the generator log sheets reveal no defects during any of the relevant weekly tests. (Docs. 56-4, 56-5). The weekly tests require a minimal amount of diesel fuel and do generate exhaust. The exhaust is released outside the jail through exhaust pipes, and Branstetter is unaware of any leaks in the pipes. The jail also has a smoke and fire detection system that sets off an alarm in any block if there's a hazard like smoke or a rise in temperature. The system passed its annual inspection on May 30, 2018. It did not go off during any of the relevant generator tests. (Doc. 56-4).

## LEGAL STANDARDS

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See Archdiocese of Milwaukee v. Doe,* 743 F.3d 1101, 1105 (7th Cir. 2014)(citing FED. R. CIV. PROC. 56(a)). *Accord Anderson v. Donahoe,* 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). *Accord*

*Bunn v. Khoury Enterpr., Inc.*, 753 F.3d 676, 681-682 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *See Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

The Eighth Amendment prohibition on cruel and unusual punishment forbids the unnecessary and wanton infliction of pain.[2] *See Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)(citation omitted). To succeed on a claim related to conditions of confinement, a plaintiff must establish both an objective and subjective element. *See Grieveson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008). As to the objective element, a prisoner must establish that the conditions deny him "the minimal civilized measure of life's necessities," creating an excessive risk to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To do so, he must show that the conditions resulted in an unquestioned and serious deprivation of basic human needs such as food, medical care,

---

[2] The threshold order identifies Teen as a pretrial detainee. Although Teen was a pretrial detainee at the St. Clair County Jail for a period of time, his claims in this case arise after he was convicted in 2016. As such, his claims are derived from the Eighth Amendment, not the Fourteenth Amendment, as stated in earlier orders. *See, e.g., Hardeman v. Curran*, 933 F.3d 816, 821 (7th Cir. 2019)(applying an objective reasonableness standard under the Fourteenth Amendment to pretrial detainee's conditions of confinement claim but explaining that the Eighth Amendment deliberate indifference standard applies to claims by "convicted prisoners."

sanitation, or physical safety. *See Rhodes*, 452 U.S. at 347. The Eighth Amendment "does not require prisons to provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans." *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001). Rather, "extreme deprivations are required to make out a conditions-of-confinement claim." *Turner v. Miller*, 301 F.3d 599, 603 (7th Cir. 2002)(citations and quotations omitted).

The subjective component of a claim for unconstitutional conditions of confinement requires demonstrating that a defendant had a culpable state of mind, that is that a defendant acted with deliberate indifference to a substantial risk of serious harm to the prisoner. *See Farmer*, 511 U.S. at 837, 842. While mere negligence does not amount to a constitutional violation, a plaintiff satisfies the deliberate indifference standard by showing that a prison official acted, or failed to act, despite the official's knowledge of a substantial risk of serious harm from the alleged unconstitutional conditions. *See Farmer*, 511 U.S. at 842; *Davidson v. Cannon*, 474 U.S. 344, 347-348 (1986). That is, prison officials must act to prevent "unreasonable peril" or to address "preventable, observed hazards that pose a significant risk of severe harm to inmates." *Anderson v. Morrison*, 835 F.3d 681, 683 (7th Cir. 2016).

### ANALYSIS

Defendants argue that there is insufficient evidence to demonstrate that Teen was exposed to an excessive risk to his health and safety. Unsafe air conditions can give rise to claims of unconstitutional conditions of confinement. While prisoners may not be guaranteed "more salubrious air," they are protected from noxious air. *See, e.g., Helling v.*

*McKinney*, 509 U.S. 25, 35 (1993)(noting that intense exposure to tobacco smoke could constitute a significant risk of harm to inmate health). Additionally, allegations of extremely poor ventilation systems have been held to satisfy the objective prong of an unconstitutional conditions claim where there is evidence of a "direct physical manifestation of the harm caused by the poor ventilation, as well as the quite likely possibility for future health problems." *See Board v. Farnham*, 394 F.3d 469, 486 (7th Cir. 2005). That said, there must be evidence that the air quality poses a danger to inmate health.

Considering environmental tobacco smoke in *Helling*, the Supreme Court determined that with respect to the objective component, the prisoner "must show that he himself is being exposed to unreasonably high levels" of the smoke. 509 U.S. at 35. The Supreme Court also reasoned that the prisoner's claim required "more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such an injury to health will actually be caused by exposure," including assessing "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Id*. at 36 (emphasis in original). Likewise, courts evaluating claims of exhaust fume exposure consider the length of time of an inmate's exposure to allegedly noxious air and also the consequences of the exposure. *See, e.g.*, *Sibley v. Dart*, No. 17-cv-6298, --- F.Supp.3d ---, 2019 WL 8544391, at *3-4 (N.D. Ill. Feb. 19, 2019)(noting that the inmate, who had asthma, was only exposed to smoke-filled air for under an hour but the air caused the inmate to lose consciousness)(citing *Morissette v. DeTella*, No. 96-C-6798, 1997

WL 619851, at *5 (N.D. Ill. Sept. 29, 1997)(noting that 45 minutes of exposure to engine fumes, which caused long-term headaches and dizzy spells, was not actionable because "brief and isolated exposure to engine exhaust does not violate the Constitution")).

When all the facts and circumstances are considered, there is insufficient evidence that Teen was exposed to noxious air at a level that rises to a constitutional violation. He was exposed to fumes for short periods of time once per week for six weeks. There is no evidence that the odor he smelled actually was harmful, but he does report mild symptoms. His symptoms, however, were headaches, dizziness, stomach pain, watering eyes, and a scratchy throat that dissipated along with the fumes, either because a fan was brought in or because the odor ended. Crediting his testimony, Teen submitted a single sick call, but he only did so to check and make sure that he was okay, as opposed to seeking treatment for a serious or lingering health problem. He did not visit the healthcare unit until May 2018. By that appointment, he had "more pressing" medical issues and did not report any lingering medical issues tied to the exhaust odor.

All members of society are exposed to incidental, fleeting exposure to exhaust fumes, and here, there is no evidence that Teen's exposure was severe or was at a level beyond what anyone would willingly accept as a part of life. Correctional officers continued their rounds and duties without any changes as a result of the alleged odor. Based on the record before the Court, it is likely that the smell described by Teen came from the test of the back-up generator system, but there is no evidence of a malfunction in the system or in the piping that led to exhaust pouring into L-Block. Teen testified that no smoke or particles related to the odor were visible in the air, and he required no

medical care in the wake of his exposure.

Teen's captain's complaints similarly do not evidence any sort of long term or lingering medical problems from the fumes, and one officer's response indicates the officer did not smell any fumes in the jail. The record is devoid of support for Teen's contention that he was exposed to unreasonable amounts of exhaust fumes or that the fumes were harmful. If the air was harmful during the generator tests, any exposure was brief and isolated, and, as such, no reasonable juror could conclude that Teen was exposed to an excessive risk to his health or physical safety. *But see Farnham*, 394 F.3d at 486 (finding triable issue of fact where prisoners claimed numerous nosebleeds and prolonged respiratory issues, which led to one prisoner's hospitalization, and where a heating contractor examined the jail ventilation system and reported that the ducts were contaminated with black mold and fiberglass in a manner that posed a health hazard).

Even if Teen could establish that he was exposed to a substantial risk of harm, he cannot establish that Lanzante was deliberately indifferent to that risk. Lanzante was involved in Teen's claims only on February 8, 2018, when he responded to a disturbance between Teen and Germaine, and on February 22, 2018, when he allegedly refused to give Teen a captain's complaint form. On February 8, 2018, another officer opened the door and got a fan shortly after Lanzante's arrival to the scene. Thus, there is no evidence that Lanzante's behavior rose to the level of deliberate indifference, or was even objectively unreasonable, on that date.

As to the claim that Lanzante refused to give Teen a captain's complaint form to report the exhaust smell on February 22, 2018, that claim is questionable since Teen

submitted an unrelated captain's complaint on that date. Nonetheless, refusing to turn over a captain's complaint form does not rise to the level of personal conduct that could be deemed to be reckless behavior towards Teen's health or safety with respect to an odor in the cell block. Teen does not allege that he was bothered by the fumes on that date, so it is unclear how that behavior displayed reckless disregard to Teen's health or safety. Even under an objective reasonableness standard, no reasonable juror could find that Lanzante's alleged behavior towards Teen during this period was constitutionally suspect.

As to Germaine, Teen's testimony suggests that he was involved in Teen's odor complaints on two dates: February 8, 2018, and March 8, 2018. On February 8, 2018, Teen testified that Germaine smelled the fumes but refused to open the door to the cell block to improve air circulation, leading to a disagreement approximately 30 minutes later after which another officer got a fan. (Doc. 56-1, p. 7-8). On March 8, 2018, Germaine again allegedly refused to get a fan.

Two discrete incidents one month apart during which Germaine continued his assigned duties and conducted rounds as usual do not rise to the level of reckless disregard for, nor did it constitute objectively unreasonable behavior with respect to, Teen's health or safety, particularly where security reasons explain a refusal to open the cell block door. The Court need not resolve this question, however, because Teen was not exposed to a substantial risk of harm as required to establish a constitutional violation.

## CONCLUSION

For the above-stated reasons, Defendants' motion for summary judgment (Doc.

56) is **GRANTED**. The Clerk of Court shall enter judgment in favor of Charles Germaine and Christopher Lanzante and shall close this case.

**IT IS SO ORDERED.**

Dated:  May 11, 2020.

Digitally signed by Judge Sison
Date: 2020.05.11 15:54:00 -05'00'

GILBERT C. SISON
United States Magistrate Judge